FILED

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

2013 APR 16  A 9: 12

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 1:13CR 176 |
| | ) |
| PARKER DRILLING COMPANY, | ) Count 1: 15 U.S.C. § 78dd-1(a)(3) |
| | ) (Violation of the Anti-Bribery Provisions of the |
| Defendant. | ) Foreign Corrupt Practices Act) |
| | ) |

## INFORMATION

THE UNITED STATES CHARGES THAT:

At all relevant times, unless otherwise specified:

### GENERAL ALLEGATIONS

#### *The Foreign Corrupt Practices Act*

1. The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. § 78dd-1, *et seq.* ("FCPA"), prohibited certain classes of persons and entities from corruptly offering, paying, promising to pay, or authorizing the payment of any money or anything of value, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

#### *The Defendant and Defendant's Subsidiaries*

2. **PARKER DRILLING COMPANY** ("PARKER DRILLING"), a provider of contract drilling and drilling-services, was incorporated in Delaware, headquartered in Houston, Texas, operated in numerous countries around the world, and employed more than 3,000 people. PARKER DRILLING's shares were registered with the Securities and Exchange Commission

1

("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934. PARKER DRILLING's shares traded on the New York Stock Exchange under the symbol "PKD."

3.      As an issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78l, PARKER DRILLING was required to file periodic reports with the SEC under Section 13 of the Securities Exchange Act, Title 15 United States Code, Section 78m. Accordingly, PARKER DRILLING was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

4.      PARKER DRILLING disclosed financial information to the public through various means, including through the electronic filing of periodic and annual reports. PARKER DRILLING electronically transmitted its filings to the SEC's Electronic Gathering, Analysis, and Retrieval System ("EDGAR") at the Management Office of Information and Technology in Alexandria, Virginia, within the Eastern District of Virginia.

5.      PARKER DRILLING operated through various subsidiaries throughout the world. In Nigeria, PARKER DRILLING operated oil-drilling rigs owned by **Parker Drilling (Nigeria) Limited**, a Nigerian entity and wholly-owned subsidiary of **Parker Drilling Offshore International, Inc.**, a Cayman Islands corporation and wholly-owned PARKER DRILLING subsidiary. PARKER DRILLING ceased drilling operations in Nigeria in 2006.

### *The Defendant's Employees and Agents*

6.      **Executive A**, a United States citizen based in Houston, Texas, was a senior PARKER DRILLING officer who performed financial and compliance functions for PARKER DRILLING from in or around 2002 through in or around 2005.

7.      **Executive B**, a United States citizen based in Houston, Texas, was a senior PARKER DRILLING officer who performed in the legal function for PARKER DRILLING.

2

8.      **Employee A**, a United States citizen based in Warri, Nigeria, was a PARKER DRILLING employee and officer of Parker Drilling Nigeria. From in or around January 2001 through in or around December 2002, Employee A was the General Manager of PARKER DRILLING's operations in Nigeria.

9.      **Employee B**, a United States citizen based in Lagos, Nigeria, was a PARKER DRILLING employee, officer of Parker Drilling Nigeria, and the General Manager of PARKER DRILLING's operations in Nigeria.

10.      **Law Firm** was a United States limited liability partnership with multiple offices in the United States. Law Firm served as outside counsel to PARKER DRILLING and provided legal and business advice to PARKER DRILLING on a number of issues, including resolution of PARKER DRILLING's customs and related issues in Nigeria. Law Firm invoiced PARKER DRILLING and was paid for its services in the United States.

11.      **U.S. Outside Counsel** was a United States citizen and a partner in Law Firm, who served as PARKER DRILLING's outside counsel. U.S. Outside Counsel provided legal and business advice to PARKER DRILLING on customs and other issues in Nigeria. U.S. Outside Counsel, through Law Firm, invoiced PARKER DRILLING from and was paid in the United States.

12.      **Nigeria Outside Counsel**, a Nigerian citizen based in Nigeria, served as one of PARKER DRILLING's outside attorneys in Nigeria. Nigeria Outside Counsel advised PARKER DRILLING on customs and other matters in Nigeria. Nigeria Outside Counsel invoiced PARKER DRILLING from and was paid in Nigeria.

13.      **Panalpina World Transport (Nigeria) Limited** ("Panalpina") was a Nigerian entity that provided a variety of logistics and customs services to PARKER DRILLING.

3

Panalpina, on PARKER DRILLING's behalf, submitted to Nigerian customs officials false documents related to the temporary importation of drilling rigs that PARKER DRILLING owned or operated in Nigerian waters. Panalpina invoiced PARKER DRILLING and was paid for its services in Nigeria.

14.    **Nigeria Agent** was a Nigerian and British citizen based in the United Kingdom. In or around January 2004, Law Firm and U.S. Outside Counsel retained Nigeria Agent to assist PARKER DRILLING in connection with customs matters in Nigeria. With one exception, PARKER DRILLING paid Nigeria Agent through Law Firm and U.S. Outside Counsel for Nigeria Agent's TI Panel-related services.

### Nigerian Officials

15.    The **Ministry of Finance of the Federal Republic of Nigeria** was responsible for assessing and collecting applicable duties and tariffs on goods imported into Nigeria and did so through a government agency called the **Nigeria Customs Service** ("NCS"). The NCS was an agency and instrumentality of the Government of Nigeria, and its employees were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

16.    The **Panel of Inquiry for the Investigation of All Cases of Temporary Import Permits Issued Between 1984 to Year 2000** (the "TI Panel") was a board empanelled for the purpose of examining certain duties and tariffs that the NCS collected or failed to collect between 1984 and 2000. The TI Panel was presidentially appointed, operated under the auspices of the Nigerian President's office, and possessed the power to issue subpoenas and levy fines. The TI Panel exercised its discretion when determining the fine amounts that it would levy. The TI Panel was an agency and instrumentality of the Government of Nigeria, and its employees

4

were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

17.     Nigeria's **State Security Service** ("SSS") was a Nigerian intelligence and law-enforcement agency that operated as a department within the Nigerian government's executive branch. The SSS was a department, agency, and instrumentality of the Government of Nigeria, and its employees were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

*Nigerian Customs*

18.     Under Nigerian law, customs duties generally were required to be paid for goods imported into Nigeria, such as rigs and vessels imported into Nigerian waters. During the relevant time, the customs duties that were assessed to permanently import a rig into Nigerian waters were significant, between approximately 10-20% of the total value of the rig. In the alternative, companies could import rigs and other items on a temporary basis pursuant to which no customs duties would be assessed. If temporarily importing a rig, the company had to post a bond ("TIP bond") with the Nigerian government as security for any duties or penalties that might be owed during the life of the TIP. Assuming no adverse events occurred during operations, the bond would be returned to the company once the rig was exported.

19.     A rig, or other item, could be imported on a temporary basis only if the item: (a) was considered a high valued piece of special equipment, (b) was not available for sale in Nigeria, and (c) was being imported/temporarily and was intended to be exported. If these requirements were met, a company, through a local customs agent, could apply for a temporary import permit ("TIP").

20.     Significantly, items imported under a TIP (and TIP extensions) could not remain in Nigeria longer than the period allowed by the TIP and/or TIP extensions. Upon the expiration of the TIP (and related TIP extensions), the owner could either choose to permanently import the rig (known as "nationalizing" or "converting to home use") or export the rig and re-import it and obtain a new initial TIP. The failure to export the rig after the TIP expired could result in the assessment of Nigerian penalties of up to six times its cost.

*PARKER DRILLING's Nigerian Operations and the TIP "Paper Process"*

21.     The drilling rigs that PARKER DRILLING operated in Nigeria were originally imported into Nigeria by Noble Drilling Corporation and were sold in or around 1996 to Mallard Drilling International, Inc. ("Mallard Drilling"). In or around late 1996, PARKER DRILLING acquired Mallard Drilling; a Mallard Drilling subsidiary, Energy Ventures International, Inc. ("EVI"); and all of Mallard Drilling and EVI's Nigerian operations and drilling rigs.

22.     By in or around 1998, PARKER DRILLING was operating five drilling rigs in Nigeria, each with a declared value of between $2 million and $18 million. Until it converted its drilling rigs to home use in or around 2004, PARKER DRILLING's Nigerian rigs all operated under TIPs. Initially, PARKER DRILLING retained the customs agent that Mallard Drilling had used to obtain TIP extensions. In or around late 2001, this agent was no longer able to obtain TIP extensions, and PARKER DRILLING then retained Panalpina to obtain TIPs and TIP extensions on PARKER DRILLING's behalf.

23.     Between about late 2001 and about April 2002, Panalpina obtained new TIPs for PARKER DRILLING's rigs by submitting false paperwork on PARKER DRILLING's behalf to avoid the time, cost, and risks associated with exporting the rigs and re-importing them into Nigerian waters (a process that Panalpina referred to as the "paper process" or "recycling").

Panalpina created and caused to be presented to Nigerian officials documents that reflected that the rigs had been physically exported and re-imported. In reality, the drilling rigs never left Nigerian waters.

### *The TI Panel's Inception and PARKER DRILLING's Proceedings Before the TI Panel*

24.     In or around late 2002, Nigeria formed the TI Panel, a Nigerian government commission assembled to review the adequacy of the TIPs that had been granted previously. Among other things, the TI Panel reviewed particular rig operators' TIPs to see whether particular TIPs had lapsed, causing a gap between TIPs. The TI Panel exercised its discretion when, among other things, determining which companies to investigate and the fine amounts that the TI Panel would levy.

25.     In or around December 2002, the TI Panel summonsed PARKER DRILLING. Beginning in or around January 2003, Nigeria Outside Counsel and PARKER DRILLING's local personnel appeared several times before the TI Panel concerning PARKER DRILLING's TIPs. On or about February 4, 2004, and thereafter, Nigeria Agent represented PARKER DRILLING before the TI Panel.

26.     On or about April 22, 2004, the TI Panel concluded that PARKER DRILLING had violated Nigeria's Customs & Excise Management Act of 1958 with respect to several of its TIPs.

27.     In or around early May 2004, the TI Panel assessed a fine of $3.8 million against PARKER DRILLING.

28.     Following the corrupt conduct outlined below, on or about May 26, 2004, the TI Panel reduced PARKER DRILLING's fine to just $750,000.

*Bribery Scheme*

29.    From the beginning, the TI Panel posed a serious problem for PARKER

DRILLING for at least two reasons. First, PARKER DRILLING failed to secure new TIPs and

subsequent extensions in accordance with Nigerian law. As a January 2003 email among

PARKER DRILLING personnel discussing the TI Panel noted, PARKER DRILLING's "main

problem is going to be providing positive documentation showing that the TI Bonds were filed

according to the requirements of the Customs laws in effect at the time."

30.    Second, PARKER DRILLING personnel, including local personnel in Nigeria,

Employees A and B, and Executives A and B were aware that the process by which PARKER

DRILLING had kept its drilling rigs in Nigeria violated Nigerian law. In or around January

2003, Panalpina informed Nigeria Outside Counsel and local Nigeria personnel that the "paper

process" violated Nigerian law, and that, if the TI Panel were to find out about it, "both

Panalpina and Parker [Drilling] will be in trouble." Executives A and B also came to understand

that the "paper process" violated Nigerian law.

31.    By in or around December 2003, PARKER DRILLING wanted to resolve the TI

Panel issues so that it could sell its drilling rigs and exit Nigeria altogether. Executives A and B

were responsible for managing PARKER DRILLING's exit.

32.    U.S. Outside Counsel introduced PARKER DRILLING to one of U.S. Outside

Counsel's clients, which suggested that PARKER DRILLING retain Nigeria Agent to resolve its

Nigerian customs issues. Nigeria Agent's resume, which U.S. Outside Counsel provided to

PARKER DRILLING, did not reflect any past experience working in Nigeria or handling

customs issues; instead, Nigeria Agent had spent around 15 years as "Executive Managing

Director" of his own group of companies and had spent 2 years before that as a mechanical engineer.

33. Nevertheless, although PARKER DRILLING conducted no additional diligence into Nigeria Agent's qualifications, after Executives A and B and others interviewed Nigeria Agent, PARKER DRILLING indirectly retained Nigeria Agent. In or around January 2004, through Law Firm, PARKER DRILLING entered an agreement with Nigeria Agent whereby Nigeria Agent would "act as a consultant to [Law Firm] to provide professional assistance resolving these issues in Nigeria." The agreement did not specify the amount or basis for calculating the fees and expenses that Nigeria Agent could charge PARKER DRILLING, other than to require an initial retainer of $50,000 and to provide for an unexplained "success fee." PARKER DRILLING wired Nigeria Agent $50,000, as soon as Nigeria Agent signed the contract.

34. With one exception, PARKER DRILLING paid Nigeria Agent indirectly through Law Firm for all services related to the TI Panel. When Nigeria Agent required funds, PARKER DRILLING transferred funds to Law Firm by wire, and Law Firm in turn forwarded those funds to Nigeria Agent by international wire. Nigeria Agent's funding requests typically first went by email to Law Firm and U.S. Outside Counsel and asked for large currency transfers, often $100,000 or more at a time. Law Firm and U.S. Counsel then forwarded Nigeria Agent's requests by email to Executive B, who discussed the requests with Executive A. Executives A and B were involved in approving Nigeria Agent's payment requests related to the TI Panel.

35. The wire communications and transfers in furtherance of the scheme included:

    a. On or about January 26, 2004, U.S. Outside Counsel emailed Executive B that "we need to wire [Nigeria Agent] an additional $50,000. The first

traunch went in retainer fees and the entertainment of the [Nigerian presidential] delegation."

b. On or about February 2, 2004, Executive B and Nigeria Agent corresponded by email concerning Nigeria Agent's upcoming meeting with Nigeria's president.

c. On or about February 9, 2004, Executives A and B corresponded by email to discuss Nigeria Agent's meetings with Nigeria's president and planned correspondence with the Minister of Finance.

d. On or about February 24, 2004, Nigeria Agent emailed U.S. Outside Counsel, copying Executive B, writing that Nigeria Agent had been meeting with the SSS and Nigeria's Minister of Finance. Nigeria Agent asked for additional money and tied the expenditures to winning the concession he was seeking for PARKER DRILLING, writing that he was "spending on average about US$3,000 a day for hotel accommodation, transport, food, entertainment, communication, and office work. . . . I need to spend another US$60,000 on public relations for the intelligence work and this will be paid when the concession is given. We will need SSS in the future. It will help me if US$100,000 is sent to my account by Friday 27 February 2004 as I plan to go to Nigeria on Sunday 29th February."

e. On or about April 13, 2004, Nigeria Agent emailed U.S. Outside Counsel, copying Executive B, writing that "there is nothing more serious than landing in Nigeria without money to resolve the problems. . . . I have meeting tomorrow in Abuja to discuss the drilling contracts. This is my reason for

making sure that I can entertain my hosts because of their promises. Therefore, please make sure that you transfer the funds today so that my Bank Officer can send to Nigeria tomorrow."

f. On or about April 19, 2004, Executives A and B corresponded by email concerning an upcoming hearing of the TI Panel. Nigeria Agent previously informed PARKER DRILLING that, although Nigeria Outside Counsel represented PARKER DRILLING in connection with the TI Panel, Nigeria Agent did not want Nigeria Outside Counsel to attend a TI Panel hearing concerning PARKER DRILLING. In the exchange, Executive A wrote that Nigeria Agent would likely "respond negatively" to any PARKER DRILLING request to have Nigeria Outside Counsel attend the hearing with Nigeria Agent.

g. On or about May 3, 2004, U.S. Outside Counsel emailed Executive B, writing that Nigeria Agent "will need $100,000 in expense advances to cover various out of pocket expenses and social events that will occur on this trip." Executive B responded by email, pointing out that Nigeria Agent had not returned $25,000 that PARKER DRILLING had previously inadvertently double-paid to Nigeria Agent. U.S. Outside Counsel told Executive B to take it up with Nigeria Agent, who said that his expenses were running "about 4000 a day per person because of the entourage entertainment."

h. On or about May 7, 2004, Executive B emailed Executive A, reciting that Executive B "spoke with [U.S. Outside Counsel] this evening after [U.S. Outside Counsel] had a conversation with [Nigeria Agent.] [Nigeria Agent]

11

said that he needs another $150,000 to accomplish his objective. Apparently he was speaking in 'code' since he was on a hotel phone from Nigeria, but stated that he had previously advised you and I about this plan in London and made reference to the analogy of 'a person being present and then leaving but if we agreed they were present all the time then they were' or something along those lines. I remember the analogy but have no recollection of any discussion about it costing $250,000 to accomplish the objective. Now he wants the balance of $150,000 to complete this." Executive A responded, "Let's just tell [U.S. Outside Counsel] we need an invoice for the $150,000 expenditure."

    i.    In response to the wire communications above, on or about January 9, February 3, February 27, April 14, May 4, May 11, and May 21, 2004, PARKER DRILLING transferred to Law Firm by wire U.S. currency for subsequent transfer by interstate and international wire to Nigeria Agent. On or about April 13, 2004, Parker Drilling Nigeria also transferred currency to Nigeria Agent by check. PARKER DRILLING transferred the U.S. currency so that Nigeria Agent could make the expenditures described above.

    36.    Until in or around May 2004, Executives A and B paid and caused to be paid all of Nigeria Agent's expenses without receiving any invoices particularly describing the expenditures' purposes. In or around May 2004, Executive B asked Law Firm for an invoice, when PARKER DRILLING's treasurer informed Executive B that the lack of invoices could raise an issue in PARKER DRILLING's ongoing Sarbanes Oxley audit, writing:

As you are fully aware, we are in the middle of SOX evaluation/documentation process. One item that is imperative for a wire transfer is a properly approved

invoice to support a wire to a 3rd party. . . . We (Treasury) do not want to be written up for non compliance when we are audited and having wires to 3rd parties without an invoice will put us in non compliance.

37.     To fulfill PARKER DRILLING's request, on or about May 10, 2004, Nigeria Agent sent to U.S. Outside Counsel an invoice for $350,000 in "professional fees for the period January – March 2004." U.S. Outside Counsel forwarded the invoice to PARKER DRILLING and informed Executive B that he would reproduce the invoice on Law Firm letterhead. U.S. Outside Counsel also forwarded a separate invoice from Nigeria Agent for $150,000 in "Professional fees for 1 April — 7 May 2004." U.S. Outside Counsel then sent to Executive B a summary invoice in the amount of $500,000, arbitrarily dividing the total $500,000 charge into separate categories entitled "fees" and "expenses," without any basis to do so. Executive B accepted the invoice and retained it in PARKER DRILLING's files, knowing that the invoice did not accurately reflect the true purpose of PARKER DRILLING's wire transfers to Nigeria Agent.

38.     Executives A and B later paid and caused to be paid additional TI Panel-related invoices, knowing that the description of fees and expenses on Law Firm's invoices did not accurately reflect Nigeria Agent's actual fees and expenses.

39.     All told, PARKER DRILLING transferred and caused to be transferred to Nigeria Agent approximately $1.25 million to address PARKER DRILLING's TI Panel issues.

40.     Nigeria Agent succeeded in reducing PARKER DRILLING's TI Panel fines. Although the TI Panel previously notified PARKER DRILLING that PARKER DRILLING would be required to pay a fine of $3.8 million, on or about May 26, 2004, the TI Panel reduced that fine to just $750,000—a reduction of $3.05 million, or just over 80 percent.

## COUNT 1
### Violation of the Anti-Bribery
### Provisions of the Foreign Corrupt Practices Act

41.     Paragraphs 1 through 40 are realleged and incorporated by reference as though fully set forth herein.

42.     From at least in or around January 2004 through in or around June 2004, within the Eastern District of Virginia and elsewhere, the defendant, PARKER DRILLING COMPANY, an issuer organized under the laws of the United States, willfully did make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, or offer, gift, promise to give, and authorization of the giving of anything of value to any person, while knowing that all or a portion of such money or thing of value would be or had been offered, given, or promised, directly or indirectly, to any foreign official, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government or instrumentalities, in order to assist defendant PARKER DRILLING COMPANY and others in obtaining and retaining business for and with, and directing business to, defendant PARKER DRILLING COMPANY and others; to wit, PARKER DRILLING COMPANY made and caused to be made from the United States in interstate and foreign commerce a series of payments totaling approximately $1.25 million to Nigeria Agent, knowing that all or a portion of those payments would be given or used to procure goods and services that

were to be given to a foreign government official in return for the diminution of a lawfully

assessed fine.

(All in violation of Title 15, United States Code, Section 78dd-1(a)(3))

Neil H. MacBride
United States Attorney

Jeffrey H. Knox
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By: _____

Jasmine Yoon
Charles F. Connolly
Assistant United States Attorneys

By: _____

Stephen J. Spiegelhalter
Trial Attorney

15